# NEW YORK SUPERIOR COURT.

JAMES H. HEROY and others, respondents agt. JOHN KERR, appellant.

The statutory provisions, which render void transfers by corporations who have refused specie payments, or in contemplation of insolvency (2 *R. S., 5th ed.,* 600, § 4) is applicable to *manufacturing companies.*

In reference to actual insolvency, neither its publicity nor knowledge by the transferee is essential to make the transfer void.

But knowledge of the *imminency* of such insolvency, *mere expectation* of its occurrence, or even *embarrassments,* ought not to prejudice an honest customer, where the insolvency has not actually occurred, or the affairs of the company remain in the hands of its officers in the usual course of business, without the interference of a court. Neither is insolvency a convertible term for a mere *refusal to pay,* although the latter may be evidence of it.

Where the *insolvency* of the company is not one of the issues made by the *pleadings,* the judge, before whom the cause is tried, is not bound to pass primarily upon it. If important to have that question passed upon (being in issue, but not by the pleadings) the request should be made on the trial *before the decision,* or by a motion afterwards to have the same inserted, or upon the settlement of the opposite party could be present.

An appellant is not entitled to claim as *error,* an *omission* of a referee or a judge without a jury, *to pass upon a material fact;* he is bound to procure a record on appeal, which shall show *affirmatively* that such referee or judge *decided erroneously* on such fact.

Where the plaintiffs purchased $5,000 worth of plate glass of the president of the glass company, with whom they had been in the habit of dealing, paying half of the purchase money in cash, and half by their stock (which was valueless;) and the president informed them that the money they so let the company have would discharge its indebtedness except that to himself; the cash was paid partly in money and partly in notes, and the stock delivered; orders for the glass were drawn by the president upon the secretary, and by him accepted, were delivered to the plaintiffs, who commenced to carry away the glass and placing labels on the remainder, with their names, occupation and address, when the sheriff levied upon and sold the remainder upon execution in favor of a judgment creditor of the company,

*Held,* that any evidence of fraud in the case committed on the defendant as a creditor of the company, by the plaintiffs and the president acting in concert, must be considered (under the exceptions taken) apart from the statute prohibiting transfers by insolvent corporations, and that there were no acts shown which would warrant the finding of a fraudulent combination between them, so as to invalidate the sale to the plaintiffs.

*General Term, December,* 1860.

*Before* BOSWORTH, *C. J.,* HOFFMAN *and* ROBERTSON, *Justices.*

THIS is an action for damages for the unlawful conversion by the defendant of certain personal property claimed by the plaintiffs.

The complaint alleges that the defendant caused some officer to carry away and sell such property while owned and possessed by the plaintiffs, and converted it to his own use. The answer put in issue the ownership and possession, and avers that they were the property of the American Plate Glass Company. It claims, also, that the sheriff of Kings county seized and sold them under executions upon judgments against such company, which was the conversion complained of.

The issues of fact were tried before a single judge without a jury, and on such trial it appeared by evidence that the company mentioned in the answer was incorporated under the general manufacturing company act, and was in operation in manufacturing glass during the years 1856, 1857 and 1858; that Lewis A. Sayre was its president, and it had also a secretary. It further appeared that the company had been embarrassed about six months before June, 1857, owing money to different persons, but principally to

its president, which was known to the plaintiffs; that about June, 1857, Sayre transferred to the plaintiffs 2,500 dollars of the capital stock of the company, promising to make it good at par, and that the plaintiffs were in the habit of purchasing glass from the company; it also appeared, that a short time before the 1st of June, 1858, the plaintiffs entered into a negotiation for the purchase of 5,000 dollars worth of plate glass; Sayre then told them that the company was going to change hands, and those into whose hands it was going to pass wanted to have the plaintiffs' stock cancelled; a few days before the 1st of June, 1858, the plaintiffs agreed to purchase such glass at a reduced price, paying half of the purchase money in cash, and half by their stock; Sayre told them that the money they so let the company have would discharge its indebtedness, except that to himself; the cash was paid partly in money and partly in notes, and the stock delivered.

It further appeared that part of the glass so sold was then in the manufactory of the company, standing against its walls, and part undergoing the process of finishing in ovens; that two orders for it, drawn by the president upon the secretary, and by him accepted, were delivered to the plaintiffs, who commenced to carry it away about the 2d of June; that they continued removing it until the 5th of that month, when they had carried away about the value of 1,500 dollars; that after one o'clock on that day they commenced placing red labels with their names, occupation, and address printed thereon, and continued so placing them until between four and five o'clock in the afternoon, when the glass was levied on by the sheriff of Kings county; it also appeared that the glass was sold at one price by the square foot, and had upon it cards containing the manufacturers measurement, and that the plaintiffs agreed to reduce the amount of their purchase from five to four thousand dollars, because it was thought the first amount would sweep away all the glass, and took the labels off a corres-

ponding amount of glass; it finally appeared that the sheriff who levied on the glass in controversy, sold it shortly afterwards by the defendants direction, and received from him a bond of indemnity therefor.

In contradiction of other testimony, the president of the company (Sayre) testified that he bought the controverted glass of the company, at the market price, without any resolution passed to that effect, in satisfaction of a debt due from the company to him, and he sold it to the plaintiffs. Some witnesses present at the levy testified they did not see the labels on the glass, and that they were at the sale, and did not hear the defendant direct the sheriff to sell the glass in question, or even see the witness there who testified to hearing such directions. Such testimony was not claimed on the argument to be, nor was it so preponderating as to any of such points as to render the decision in favor of the plaintiffs plainly against the weight of evidence.

The actions in which the levy was made were begun in May, 1858, by serving a summons upon Mr. Sayre and the secretary of the company, and judgments were entered by default thereon, on the 8th June, 1858. One was on a note made in 1856, payable on demand; no time of demand was stated in the complaint in such suit; the other was on a claim of the president (Sayre) for a balance of account, also due in May, 1858, for nearly 58,600 dollars: notes of the company, which had previously lain over, were paid before the 1st of June, 1858.

On the trial the defendants requested the court to hold:

1st. That the title, at the time of the levy, was in the company, and no sale had then been made by it to any one.

2d. That if such sale had been made to any one, it was to Sayre, for an antecedent debt, and that the company was insolvent at the time of the sale, and had refused to pay its notes in specie, and therefore the sale was void.

3d. That if the sale was to the plaintiffs, it was void for the same reason.

4th. That the sale was fraudulent and void, as against the defendant, a creditor of the company.

After the decision was made and filed, by the judge who tried the cause, the defendant, *in some way which does not appear*, requested him to find on the questions of fact whether the company was insolvent or had refused to pay its notes in specie before the transfer to the plaintiff.

The judge before whom the cause was tried, found, as a conclusion of law, that the plaintiffs were entitled to recover, and that the facts which he was requested to find after such decision were not in issue. The only facts found by him were as follows: that the goods in controversy were the company's before June the 1st, 1858; that orders were delivered for it on that day and the next to the plaintiffs by the president of the company; that actual possession of other glass sold at the same time had been taken by the plaintiffs before the 8th day of June, 1858; that the plaintiffs had control of, were in the course of removing, and had labelled with their name the goods in controversy; that they paid a valuable consideration therefor, and the sale in question was binding on the company. The recovery of the judgments under which the levy was made, the fact of such levy, a purchase of the goods thereupon by the defendant, and his taking possession thereof, with notice of the plaintiffs' claim, were among such facts found.

Separate exceptions were filed to the facts so found; an exception was also taken at the trial to the exclusion of the question, "What was the financial condition of the company?" put to Dr. Sayre, while under examination, before any evidence had been given of any sale other than that directly from the company to the plaintiffs, or for any other consideration than the money paid by them, as well as the stocks surrendered.

W. W. NILES, *for respondents.*

WINCHESTER BRITTON, *for appellant*

who argued the following points :

*First.* The transaction under which plaintiffs claim title to the glass in controversy, was with Lewis A. Sayre, in his private capacity, and was not with the "American Plate Glass Company." The evidence is conclusive on this point.

Heroy (plaintiff) says: " The consideration was one-half in money and one-half in stock of the American Plate Glass Company." " I took that stock originally from Dr. Sayre; the agreement was, that in case Dr. Sayre did not carry out a certain agreement, it was to be made good to us." " Dr. Sayre told us that he was bound to make our stock good to us; I delivered the stock to Dr. Sayre." Dr. Sayre says: " The stock of the company had no market value at all in June, 1858; it could not be sold. I made the transaction with the plaintiff in reference to plate glass. The company was good for nothing. I had sold the plaintiffs some stock at low price—fifty cents on the dollar. There was no arrangement, except it was to be made good to them at par value in a year. I had never sold any stock, except to personal friends, as to plaintiffs. I had become so much involved that I sold them the company's glass; as the company owed me a large amount of money, the company had agreed to let me have glass because they owed me money; the company agreed to let me have it at market price, in payment of my debt; don't know of any resolution passed by the company." Again: " I owned the stock I had sold them; I gave my notes to plaintiffs for half the difference between $5,000 amount of first sale, and $4,000 finally taken."

The orders for the glass were drawn in the name of Sayre, in his private capacity, and deducted from the amount to be charged to his account.

The receipt for the money is signed by Sayre in his individual capacity.

*Second.* Such sale was void, and could give no title, as Sayre had no title, or authority to sell.

1. Sayre was a creditor of the company, and was its presi-

dent.   He claims that the company agreed to let him have the glass in payment of their debt to him.

There was no resolution of the board of trustees, showing any such transaction, and how the company so agreed does not appear, nor can it be supposed how any such agreement could be made, otherwise than by resolution. The assent of the several members of the board, separately, would not be enough.   (*Livingston* agt. *Lynch*, 4 *Johns. Ch. R.*, 596, 597.)

The officers could not give assent to such a transaction, for there is no proof of any authority on their part, and it cannot be presumed, the transaction not being within the ordinary business of the company.   (*McCullough* agt. *Moss*, 5 *Denio*, 567.)

II.  Any sale or transfer, if made by the company to Sayre, would have been void.

1.  The company had refused the payment of its notes, one of the judgments under which defendant justifies having been obtained on one of those very notes.

2.  The transfer, if made, was in contemplation of insolvency.   In fact, the company was insolvent.

3.  A transfer thus made is void.   (*R. S.*, *part* 1, *ch.* 18, *tit.* 4, §4, (2*d vol.*, 5*th ed.*, *p.* 600;) *Harris* agt. *Thompson*, 15 *Barb R.*, 62.)

*Third.*  If it was an attempt at sale by the glass company to the plaintiffs, it lacked every element of consummation.

I.  The president could not make such a sale, acting in his individual capacity.

II.  He could not make a sale of the effects of the company to pay an individual obligation.

III.  He could not sell the effects of the company, and take in part payment worthless stock.

IV.  The order of the president of the company, in his individual capacity, accepted by one assuming to act as secretary, or even by an actual secretary, in the absence of

the proof of any authority, would not transfer the title to the property. (*McCullough* agt. *Moss*, 5 *Denio*, 567.)

V. There is no proof that the company did or were to receive any pay for its property, or any benefit from the transaction.

VI. Such attempt would have been void under the second clause of part 1, chapter 8, title 4, section 4 of the Revised Statutes, *ante*.

*Fourth.* The transaction was a fraud upon the creditors of the company.

The president of the company, in pursuance of a personal agreement, made long before with the plaintiffs, to indemnify them for loss on stock purchased of him in his individual capacity, sells at low prices all, or nearly all the assets of the company to the plaintiffs, and takes in payment half cash and half worthless stock, thereby indemnifying the plaintiffs for loss on the stock, as he had previously agreed. He then draws an order on the company, which one H. N. Beers, signing as secretary, without authority, accepts, and the plaintiffs enter upon the premises of the company to select their glass. Some stands around the room, and some is in ovens unmanufactured. Plaintiffs proceed to select, and remove to another part of the premises. The president sends word that they must hurry up, or the sheriff will have the property. They send their cards, and one of the partners puts them on to the glass not yet selected, taking memorandum of the measurements formerly marked on the glass, until he marks—he knows not how much. This is done at 3 P. M., and at 4½ the sheriff arrives and levies. The partner makes his computation that night or the next morning, and then, for the first time, knows how much or how little he has marked. If all this is not an attempt on the part of all hands to defraud the creditors of the company, it would be difficult to tell what would be such an attempt.

*Fifth.* The title to this property did not pass, independent of any statute.

1. The contract was for $5,000 worth of glass (subsequently reduced to $4,000) in the company's warehouse, to be selected from a larger quantity by the purchasers. The glass was to be of the same price, but was of various dimensions. It was necessary to make the selection and ascertain the quantity before the title would be in the purchasers. A part ($2,700 worth) was removed. That was not taken by the sheriff. As to the balance, the dimensions were noted; and the cards of the plaintiffs pasted on the plates, but the quantity so marked was not known or amount computed till after the levy. Something remained to be done to vest the title in the plaintiffs. They may have had too much or too little; the data for them to give their assent, so as to be bound thereby, were not ascertained, and their assent was not, and could not be given. The selection had not been actually made; they had only taken measures to get information on which to base their selection. The property was not at their risk if destroyed. The sale was equivalent to a purchase of 10,000 feet of glass at forty cents a foot, to be messured and selected. That had not been definitely done. They may have taken the memorandum of too many feet, and marked too many plates; if so, some must be relinquished before the selection was perfect. Which were to be relinquished was to be determined. The property was not separated and identified. The mere putting on cards promiscuously, without ascertaining definitely the quantity, did not identify the property as the property of the plaintiffs. (*Crofoot* agt. *Bennett*, 2 *Coms.*, 258; *Ward* agt. *Shaw*, 7 *Wend.*, 405; *Andrew* agt. *Dieterich*, 14 *Wend.*, 31; *Rapelye* agt. *Mackie*, 6 *Cow.*, 253.)

*Sixth.* The court erred in finding, as a fact, that the glass was, at the sheriff's sale, purchased by and came into the hands of the defendant. There is no evidence in the case

tending to show any such fact. There is no proof of conversion by defendant.

*Seventh.* The court erred in excluding the question at case, fol. 61, and in refusing to find on the fifth and sixth questions.

I. The question was .clearly relevant, and the findings, if in the affirmative, as they must have been, even under the evidence which was admitted, were fatal to the cause of action.

II. The evidence was competent under the pleadings, and the facts should have been found. The complaint alleges that the plaintiffs were the owners of the property; the answer denies ownership, and it was competent thereunder for defendant to attack any part of the transaction under which plaintiffs claim to make title. If the transaction was void under the prohibitions of the Revised Statutes, it was competent to show it under that issue.

III. If the objection to the question excluded was because of defect in not alleging the statutes in the answer, then it should have been so stated at the trial, and the defendant could have moved to amend. (*Merritt* agt. *Seaman*, 6 *Barb.*, 330, 335; *Elwood* agt. *Diefendorf,* 5 *Barb.*, 398; *Jackson* agt. *Hobby*, 20 *John.*, 357; *Norman* agt. *Wells*, 17 *Wend.*, 136, 142.)

*Eighth.* Judgment should be set aside and a new trial ordered.

By the court, ROBERTSON, Justice. The admissibility of the question as to the financial condition of the company, put to its president as the facts appeared in evidence at the time it was put, requires to be disposed of before the objection raised to the final decision. At that time the only sale of which evidence had been given, was one directly from the company to the plaintiffs for cash, a promissory note, and shares of stock, without knowledge on their part of any embarrassment of the company, except one, which

it seemed able to contend against, and all of which they were informed the money they were to furnish could immediately remove, except ,the debt to the very person who made the sale to them. No evidence had then been given of a transfer to the president to pay a debt due to him, with a second sale by him to the plaintiffs.

The statutory provisions, which renders void transfers by corporations who have refused specie payments, or in contemplation of insolvency (2 *R. S.*, 5*th ed.*, 600, §4,) has been held to be applicable to manufacturing companies, such as the one in question (*Harris* agt. *Thompson*, 15 *Barb. R.*, 62; *Bowen* agt. *Lease*, 5 *Hill R.*, 221;) it has also been held, in reference to actual insolvency under a similar prohibition, that neither its publicity nor knowledge by the transferee is essential to make the transfer void (*Bower* agt. *Harbeck*, 5 *Seld. R.*, 589;) but if the terms of the statute in question embrace sales in the ordinary and legitimate business of such company, at times when it might be held afterwards to have been on the verge of insolvency, and, therefore, in contemplation of it, it is plain the whole business of the company would be impeded, because no one would deal with it at such a hazard, and the purpose of the statute incorporating such institutions would be defeated. Even knowledge of the imminency of such insolvency ought not to prejudice an honest customer, where the insolvency has not actually occurred, or the affairs of the company remain in the hands of its officers in the usual course of business, without the interference of a court.

The statute evidently only intended to prevent injurious preferences, as in a similar provision in reference to banking incorporations (2 *R. S.*, 5*th ed.*, 519, § 9.) The transfer to officers and stockholders, prohibited in a previous part of the same section (2 *R. S.*, 600, §4,) are specified as being *for the payment of debts*, and such transfers as are

included with those to all other persons in the one clause
by which the act itself is avoided.

*Contemplation of insolvency* must also mean something
more than mere *expectation of its occurrence* ; it must include
provision against its results, so far as the transferee is con-
cerned, and that can only be applicable where he is already
a creditor, and the object is to take his debt out of the
equal rateable distribution of the assets of the company
when insolvent.

In this case, as the evidence stood when the question
under consideration was put, the plaintiffs had made a *bona
fide* purchase of wares in which the company usually dealt,
without knowledge of any other kind of insolvency than
that if any, which was implied in embarrassments, which I
shall presently have occasion to show, are not sufficient to
create the predicament of contemplated insolvency called
for by the statute ; there was, therefore, no foundation laid
for inquiring into the condition of the company when the
question under consideration was put.

The defendant claimed, in a subsequent part of the trial,
the benefit of such statutory prohibition, by calling upon
the court to find that such sale was void for a violation of
it, and excepting to its refusal to obey such call.    Even
then, however, the case had only been varied by testimony
tending to show a transfer to Dr. Sayre, and a sale by him
to a *bona fide* purchaser without notice; this variation of
the aspect of the case would only strengthen it for the
plaintiffs, as such sale to a *bona fide* purchaser would, when
unassailed, preclude the objection being taken of illegality
in the first sale to Dr. Sayre.    But behind all these lies the
fact that there was no proof of the insolvency of the com-
pany at the time of the purchase ; notes of theirs, which
had lain over, had been taken up.

The complaints in the actions in which the judgments
were recovered, it is true, state non-payment of debts, and

evidences of debt, but they were no evidence against the plaintiffs, who were no parties to such suits, and who bought the goods in question before the judgments in such actions were recovered; besides which much the larger claim of the two was that of Dr. Sayre, which had been assigned to the defendant, and which the plaintiffs had good reason to believe would not be used to cripple the company.

Both judgments were entered upon a service of the summons upon Dr. Sayre, who might have had an interest in allowing judgment by default, if it would be to defeat a sale made by him. But, at all events, even if such judgments were admitted in evidence, the mere non-payment of the debts mentioned in such complaints did not constitute *insolvency* within the meaning of the statute in question; the prohibition in the fourth section distinguishes between refusals to pay evidences of debt and insolvency (2 *R. S.*, 600, *5th ed.*;) so, too, in the statute respecting proceedings in equity to dissolve corporations to which this may be supposed to refer, the same distinction is preserved. (3 *R. S.*, *5th ed.*, 763, §§ 46, 47.) Insolvency is not a convertible term for a mere refusal to pay (*Cutler* agt. *Sawyer*, 2 *Youngs & Jervis R.*, 459; 2 *Bouv. Inst.*, 157,) although the latter may be evidence of it; this company, although embarrassed, had conducted business for eighteen months before the transaction now before us. We.have no means of knowing the credit or assets of the company, or what they were worth; the value of their property may have far exceeded their indebtedness; it is not until all means and reasonable hopes of raising money to meet it are gone that statutory insolvency begins. The refusal, therefore, to find that the sale to the plaintiffs was void by the statute, was fully warranted as matter of law.

But the insolvency of the company was not one of the issues made by the pleadings, and, therefore, the judge before whom the cause was tried, was not bound to pass primarily upon it. After the cause had been tried and the

decision was given the case states a request was made of the judge to find such insolvency, how, when, or where does not appear; whether by private solicitation, or a motion in court, or in the settlement of the case. It also appeared that the judge refused to pass upon it because it was not in issue : whether this was a good reason or not for the refusal is immaterial. Perhaps it was in issue, although not one of the issues made by the pleadings. If it was important for the defendant to have such fact, although not in issue by the pleadings passed upon by the court, the request should have been made on the trial before the decision, or by a motion afterwards to have the same inserted, or upon the. settlement of the case, when the opposite party could be present. There is no reason why such should not be the practice in regard to a trial by a court without a jury, as well as in regard to one before a referee, which is the established practice. (*Van Steenberg* agt. *Hoffman*, 6 *How. Pr. R.*, 492; *Hulce* agt. *Sherman*, 13 *id.*, 411; *Renouil* agt. *Harris*, 2 *Sand.* (*S. C.*) *R.*, 641; *Church* agt. *Erben*, 4 *id.*, 691.)

The Code makes no mention of exceptions except on the trial and to decisions on matters of law arising on such trial, and a review of questions of fact is only to be had on a case or exceptions as on a trial by jury. (§ 268.) Great injustice would ensue if a new trial could be had for a refusal to insert in a decision already written and filed, adjudications upon facts not mentioned in the pleadings without a request before such a decision to pass upon such facts. If the refusal to accede to such request was made in court, either upon a motion to insert the determination of the particular fact in the case, or on the settlement of such case, and it was improperly refused, the remedy would be by motion for a resettlement or appeal from such denial as an order on a motion, not by exception to it as to a decision on a trial so as to send the whole case for a new trial.

But in addition to the supposed error of a refusal to pass upon a particular fact, it has been suggested that the de-

cision of the judge at special term was radically defective for omitting to pass specifically upon some of the issues made by the pleadings, such as

1st. The direction of the defendant to levy upon and sell the property in question.

2d. The previous ownership of the plaintiffs, or what is equivalent, the previous sale of it by the company to them, and the execution and delivery of the orders to them for the goods by authority, of such company, with the actual delivery of such goods to, and possession thereof by them, and finally a demand upon the defendant for the goods, and refusal or some other act of conversion. As the decision does not contain any special adjudication of such facts, the question of course arises whether the defendant can take advantage of such omission, either with or without an exception.

The provisions of the Code respecting reports of referees are very nearly identical with those respecting decisions by a court upon a trial by it without a jury. (§§ 268, 272.) Referees are required to "state the facts found and the conclusions of law separately." Their report on the whole issues becomes the judgment of the court, and the judgment may be entered thereon as on a decision by a court. In settling a case or exceptions for a review of his decision, he is required briefly to specify therein "the facts found by him, and his conclusions of law." The question then arises, what effect is produced on the judgment by an omission to state material facts either in the first decision or such subsequent findings.

It has always been held both before (*Curtis* agt. *Staring*, 4 *Wend. R.*, 198; *Cafferty* agt. *Keeler*, 12 *id.*, 291; *Stafford* agt. *Bacon*, 6 *Hill R.*, 264) and since the adoption of the Code, (*Church* agt. *Erben*, 4 *Sand. R.*, 691; *Renouil* agt. *Harris*, 2 *id.*, 641; *Van Steenberg* agt. *Hoffman*, 6 *How. Pr. R.*, 492; *and Hulce* agt. *Sherman*, 13 *id.*, 411, *overruling Laking* agt. *The Erie R. R. Co.*, 11 *How, Pr. R.*, 412) that

omissions in the report of a referee on findings of fact by them could be supplied by motion.

In *Hulce* agt. *Sherman* (*ubi sup.*) it was held that an appeal to the general term as an appellate court, was "*not the proper remedy for an omission*, the referee had not erred in passing upon the defence, but had omitted to do so."

In *Johnson* agt. *Whitlock* (3 *Kernan R.*, 348) the court say, that if the statement of facts and conclusions of law were imperfectly made, " there was no doubt of the power of the supreme court to order a re-settlement." There seems to be no good reason why the decision of a court without a jury should not be subjected to the same process.

The question whether an appellant is entitled to claim as error an omission of a referee or judge without a jury to pass upon a material fact, or whether he is bound to procure a record on appeal which shall show affirmatively that such referee or judge decided erroneously on such fact, has been several times before the court of appeals.

In *Otis* agt. *Spencer* (16 *N. Y. R.*, 611) the judgment was affirmed, because the record did not establish an error, although there was an omission.

In *Carman* agt. *Pultze* (21 *N. Y. R.*, 547,) there was, as stated by the court, "an evident omission of *important* facts in the statement or report," and it was held that those facts must be presumed to have been such as warranted the judgment appealed from; that such reports and statements are not construed with the strictness applied at common law to special verdicts, and that it was incumbent on the appellant so to present the facts upon which the case depends as to show affirmatively that an error had been committed, that if recourse was to be had to any presumption, it was only to be to such as would sustain the judgment. A still more direct and explicit adjudication is to be found in favor of the respondents in the case of *Grant* agt. *Morse*, decided in the court of appeals at their last term, to the effect, " that a general conclusion of a referee is to be con-

strued as a finding upon all the material questions, though such a finding be not expressed in terms," and that to found an objection to the omission of the referee to find one way or the other upon a particular question of fact, he should be specifically requested to do so, and an exception taken to his refusal. The same principles were applied to the case of a decision by a judge withont a jury, in *Viele* agt. *The Troy and Boston Railroad Co.*, (20 *N. Y. R.*, 186,) where no facts were found by the judge.

The restoration of the 267th section of the Code to its original condition, as regarded decisions by judges without a jury, by the amendment of 1860, does not affect the question. It is merely directory, as is the requisition that a decision should be filed in twenty days (*Burge* agt. *Baker*, 4 *Abb. P. R.*, 11; *The People, &c.*, agt. *Dodge*, 5 *How. R.*, 47; *Stewart* agt. *Slater*, 6 *Abb. P. R.*, 84,) or, at the most, gives an appellant a right to have such statement inserted, and does not make it error to omit it.

The cases of *Astor* agt. *L'Amoureux*, (4 *Seld. R.*, 107,) or *Griffin* agt. *Cranston*, (1 *Bosw. R.*, 281,) do not militate against these views. In the first the court of appeals merely held that this court at general term had no right to give judgment absolutely for the appellant on reversal of a judgment at special term, unless the respondent could not alter his case on a new trial, and so that case was interpreted in *Edmonson* agt. *McLoud*, (16 *N. Y. R.*, 545,) subsequently.

In the other case, (*Griffin* agt. *Cranston*,) the court at special term found certain facts justified by the evidence and thereupon decided as a conclusion of law, that a transfer of property assailed in such case was made with intent to defraud creditors. This court held at general term, that such intent had been inferred from such facts as *matter of law*; thus bringing it within the principle of *Titus* agt. *Orvis*, (16 *N. Y. R.*, 617.) It does not appear whether the court, at general term, would itself have inferred such intent from such facts as matter of fact, but they reversed

the judgment at special term because such facts did not sustain such intent as *matter of law*. This clearly did not involve the question of an omission to pass upon material facts or error in passing upon them, the decision turned entirely upon a question of law, as applicable to the facts found.

Any evidence of fraud in this case committed upon the defendant as a creditor of the company, by the plaintiffs and Sayre acting in concert, must be considered apart from the statute prohibiting transfers by insolvent companies, and there is certainly none sufficient to warrant this court in holding differently in reference to such fraud from what was held at special term. If the president misappropriated the property of the company to discharge his own obligations, it is a matter for which he may be liable to the company, but it does not invalidate the sale. The worthlessness of the stock delivered was not proved to have been known, and the president induced the plaintiffs to advance an additional sum. The plaintiffs, without any hurry, removed the goods gradually and openly. There is even evidence that the defendant knew of such removal, and stated his only objection to be that it took all the glass. Up to the very time of the levy the removal continued. I am unable to see in any of these acts a fraudulent combination between Sayre and the plaintiffs, and they furnish no reason for reversing the judgment.

The last objection is, that the evidence in the case did not make out a delivery of the goods to the plaintiffs by the company. It is claimed, that until selection the title by delivery was not complete; that by taking possession at first of more than was necessary, by making the levy, the plaintiffs did not come into possession under the sale of the quantity sold until they rejected what they did not wish to retain, which they did not do until after the levy.

The case of *Crofoot* agt. *Bennett*, (2 *Coms. R.*, 258,) disposes of this objection. It was there held that the posses-

sion of a whole brick kiln by a vendee, out of which he had bought a certain quantity, to be selected by him, was a sufficient delivery of the bricks purchased, and enabled the vendee to select them at any time.

In this case the plaintiffs took the only possession they could, by exercising acts of control, and putting on labels to indicate their ownership. There was some little conflict in the evidence as to putting on the labels, but the testimony preponderates in favor of its having been done.

Upon the whole, therefore, there being no error of law or fact committed on the trial or in the decision, the judgment must be affirmed, with costs.